**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO.  20-14 |
| | : | |
| MAURICE MULDROW | : | |

# MEMORANDUM WITH
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**KEARNEY, J.**                                                    **November 3, 2020**

      Police officers promptly respond to a 911 call regarding a Black man with a gun at an apartment building in a high crime area. An arriving officer observes a Black man along the side of the identified apartment building in his hoodie sweatshirt which visibly shows an L-shaped bulge in his front hoodie pocket an experienced officer believes represents a gun. The officer watches the same man walk off the sidewalk and place an object at the base of a bush next to the apartment building. When the officer stops him moments later and directs him to leave his hands on the hood of a truck, the man drops his left hand from the truck hood to his waist and the officer responds by brandishing his firearm and ordering the man to stay still with his hands on the truck hood. Along with backup officers, and while handcuffing the man to ensure officers's safety given a 911 call regarding a gun and the officer's belief he saw a gun moments earlier, the officer sees a clear plastic baggie in the man's open hoodie front pocket which he recognizes as containing a crack cocaine "cookie." The officer searches the man's open hoodie front pocket and finds crack cocaine and packaging materials. The officer then promptly finds a gun in the bush where he saw the man walk just seconds earlier. He places the man in the back of his patrol car at which time they have a series of short conversations, some of which involve custodial

interrogation without *Miranda* warnings. The police charge the man with possession of cocaine and the gun. The man now moves to suppress the seizure of the drugs and statements made without *Miranda* warnings.

As the arrested man's counsel argues, there may be much to be concerned about in the officer's rendition of finding the drugs in his front hoodie pocket but for the compelling evidence presented by the officer's body camera and our evaluation of the experienced officer's credible testimony. We are reminded today of the value in recording police conduct including through a body camera for the protection of officers.[1] Having carefully evaluated the credibility of the testifying officers and scrutinized the footage from the officers' body cameras, we deny Defendant's Motion to suppress the narcotics found in his open hoodie pocket and statements volunteered by him absent interrogation. We grant Defendant's Motion to suppress statements responding to custodial interrogation.

## I.      Findings of Fact

1.      At around 6:00 p.m. on October 29, 2019, a 911 Philadelphia Police dispatcher issued a call for police service.  The dispatcher informed the officers there had been a report of Black man with a gun at Apartment 43 in an apartment building at 1422 North 10th Street, Philadelphia, Pennsylvania.

2.      1422 North 10th Street is one of several low-rise apartment buildings on a block in North Philadelphia. Facing the apartment building from 10th Street, a grassy area and a pedestrian path are situated on the right-hand side. On the left-hand side, Master Street runs perpendicular to 10th Street. Master Street connects to a short, no-outlet road called Warnock Street which runs immediately behind the apartment buildings until a dead end.

3.      The officers credibly testified this area in North Philadelphia has a high incidence of violent and gun-related crimes based on their experience.

4.      Multiple officers responded to the dispatch call. Philadelphia police officers Dyrda and Kelly arrived first. As they approached the apartment building, they saw Maurice Muldrow standing in front of the apartment building exiting a Nissan SUV. Mr. Muldrow, a large man standing more than 6 feet tall and weighing around 275 pounds, wore a red, form-fitting hooded sweatshirt which had a large front pocket commonly referred as to a "hoodie."

5.      Officer Kelly's body camera depicts Mr. Muldrow closing his car door and walking to the side of the building across the grass to the pedestrian path to the right of the building.

6.      Officers Dyrda and Kelly walked past Mr. Muldrow without stopping or speaking to him, and they proceeded to the apartment identified in the 911 call.

7.      They found the apartment door wide open, with no one home.[2]

8.      Sergeant Stephan also responded to the 911 call. Sergeant Stephan served as a Philadelphia police officer for more than thirteen years. During his time as an officer, he served for one year as a routine patrol officer, nine years as a tactical patrol officer, and three years as a highway patrol officer. He recently received a promotion to Sergeant in the 16th District.  He has arrested more than 250 individuals for firearms violations throughout his career. He made several firearm arrests within a five-block radius of the location of the stop and responded to 911 calls for shootings and homicides in the same geographic area. Sergeant Stephan is about 5'9" and weighs around 165 pounds.

9.      Sergeant Stephan and Officer Kelly wore body cameras recording their movements and most of the audio surrounding their interactions, which we studied before and after our evidentiary hearing.[3]  The officers showed us the exact placement of the body camera on the right side of their mid-chests.

10.     Responding to the dispatcher call, Sergeant Stephan drove down Master Street alone in full uniform in his marked patrol car when he observed a police car parked outside the apartment building on 10th Street.  Seeing Officers Kelly and Dyrda at the front of the apartment building, he continued past 10th Street to circle around to the back of the apartment complex.  He continued down Master Street and turned right onto Warnock Street.

11.     Sergeant Stephan drove northbound up Warnock Street behind the apartment buildings when he saw Mr. Muldrow briskly walking toward him, heading eastbound toward Warnock Street on the pedestrian path bordering the apartment building.[4]

12.     Sergeant Stephan saw Mr. Muldrow's right hand pressed tightly against his front hoodie pocket.[5]  At one point, Mr. Muldrow removed his hand revealing an L-shaped bulge in his front hoodie pocket.[6]

13.     Sergeant Stephan credibly testified he believed the bulge to be a gun based on his thirteen years of experience as a police officer and 250 firearm-related arrests.

14.     When Mr. Muldrow saw Sergeant Stephan's patrol car, Mr. Muldrow slowed his pace and starting walking on the path. [7]

15.     When Mr. Muldrow reached the end of the pedestrian path just beyond the apartment building, he turned left down Warnock Street and proceeded toward Master Street and away from Sergeant Stephan's patrol car passing him on Warnock Street.

16.     Sergeant Stephan credibly testified Mr. Muldrow then looked over his shoulder at Sergeant Stephan's passing patrol car.

17.     Sergeant Stephan made a three-point turn at the end of Warnock Street approximately forty feet beyond the apartment building.  As he slowly made the three-point turn,

Sergeant Stephan kept an eye on Mr. Muldrow in his red hoodie then about fifty to seventy-five feet behind his patrol car.[8]

18.     Sergeant Stephan credibly swore, consistent with his contemporaneous statements to his fellow officers recorded on his body cam, he saw Mr. Muldrow veer from the Warnock Street sidewalk, pick up his pace, and abruptly angle toward a large bush about five feet off the sidewalk directly in front of the apartment building. Sergeant Stephan described Mr. Muldrow's demeanor as "frantic."[9]

19.     Sergeant Stephan saw Mr. Muldrow make a shoving motion at the bush, which Sergeant Stephan perceived as Mr. Muldrow attempting to hide something in the bush.[10]

20.     After shoving something into the bush, Mr. Muldrow attempted to spin off the larger bush—while looking back in the direction of Sergeant Stephan's patrol car—but tripped on a smaller bush as he angled back toward the sidewalk.[11]

21.     Sergeant Stephan saw Mr. Muldrow stagger back toward the Warnock Street sidewalk.[12]

22.     Sergeant Stephan then turned on his overhead lights and pulled up beside Mr. Muldrow as he walked down Warnock Street and asked if Mr. Muldrow would speak with him.

23.     Sergeant Stephan then activated his body camera and stepped out of the patrol car.[13]  The body camera confirms dusk but we can readily see the events.

24.     Immediately upon opening his patrol car door and stepping onto Warnock Street, Sergeant Stephan instructed Mr. Muldrow to put his hands on the hood of a red truck parked on Warnock Street.  Mr. Muldrow complied and placed his hands on the hood of the red truck while Sergeant Stephan got out of the car.

25.     Sergeant Stephan, at this point alone without backup officers who remained around the front of (or inside) the apartment building, told Mr. Muldrow not to move.

26.     The body camera footage confirms Sergeant Stephan attempted to use his radio, and as he did, Mr. Muldrow quickly took his left hand (the side further away from Sergeant Stephan) off the hood of the red truck and reached towards his hoodie pocket in the waist area.

27.     Seeing Mr. Muldrow drop his left hand below the hood of the red truck, Sergeant Stephan brandished his firearm and yelled, "don't reach for nothing, don't you f*ucking reach for nothing, you understand me?  Don't you f*cking reach again."

28.     Mr. Muldrow put his hands in the air and then back onto the red truck's hood.

29.     Sergeant Stephan called for backup.  He told Mr. Muldrow again not to reach for anything and Mr. Muldrow responded, "I didn't do nothing."  Sergeant Stephan told the officers responding to his call for backup to "step it up," and he stood at a distance from Mr. Muldrow with his gun pointed at Mr. Muldrow.

30.     Sergeant Stephan credibly swore he thought Mr. Muldrow might have a gun, based on the gesture toward his waist, and he did not want to approach Mr. Muldrow given the considerable size discrepancy between them.[14]

31.     When the backup officers arrived moments later after running around from the front of the apartment building, Sergeant Stephan approached Mr. Muldrow and asked, "do you have any weapons on you sir?" and placed his hands on the middle of Mr. Muldrow's back.  Mr. Muldrow said he did not.  Sergeant Stephan asked Mr. Muldrow to spread his legs.  He and his fellow officers then began handcuffing Mr. Muldrow.

32.     At this point, the body camera footage filmed from the right side chest of Sergeant Stephan reveals a clear plastic baggie protruding from the left side of Mr. Muldrow's front hoodie pocket.

33.     Sergeant Stephan swore from his vantage point looking into Mr. Muldrow's open hoodie pocket—standing behind Mr. Muldrow to his left and thus viewing the pocket from at least a couple inches to the left of the body camera view—he could "see clearly into" Mr. Muldrow's pocket and could see the clear plastic baggie contained what he believed to be a "cookie," or cooked, uncut crack cocaine. [15]

34.     The body camera confirms Sergeant Stephan took out the baggie, looked at it, and put it back in Mr. Muldrow's open hoodie pocket, purportedly because he had second thoughts about handling the evidence without gloves.[16] He then pulled the baggie back out and began pulling other items out of Mr. Muldrow's front pocket.

35.     Sergeant Stephan's search of Mr. Muldrow's open hoodie pocket uncovered two other bags of packaged crack cocaine and another large chunk of bulk crack cocaine.

36.     While Sergeant Stephan searched Mr. Muldrow's hoodie pocket, he told the backup officers "Be careful, he threw something behind that bush" and pointed at the bush immediately in front of apartment building to which he was referring. He did not specify he suspected the "something" to be a gun. Mr. Muldrow waited a few seconds and then said, "Sarge, I ain't put nothing by that bush." Sergeant Stephan responded, "OK."

37.     Seconds later, an officer yelled, "Gun!"

38.     Sergeant Stephan told the officers to "hold the gun for DNA" and assured them he would deal with the gun.

39.     Mr. Muldrow then said, "the drugs is [sic] mine, sir . . ." to which Sergeant Stephan interrupted and said, "ok I watched you throw the gun too, man so just relax."

40.     Mr. Muldrow asked, "can I have a talk with you please?", to which Sergeant Stephan replied, "yeah I'll talk to you in a second, alright, let's go this way."

41.     Sergeant Stephen then led Mr. Muldrow to Sergeant Stephan's patrol car, secured him in the car, and closed the door.

42.     Sergeant Stephan then went over to the bush alongside the apartment building and the officers pointed to the gun. Sergeant Stephan recounted the same series of events to the officers and then went to his car to get some gloves.

43.     Having put on his gloves, Sergeant Stephan recovered a 9mm Taurus, loaded with seventeen live rounds, from the base of the bush. While handling the gun, Sergeant Stephan told his fellow officers he thought Mr. Muldrow might have had a second gun.

44.     Sergeant Stephan recorded the firearm's serial number and ran it through the National Crime Information Center Database, which revealed the gun found in the bush as stolen under District Control Number 2019-26-042353.

45.     Sergeant Stephan then put the recovered items on the trunk of his patrol car and called for a police van to more comfortably transport the defendant.  As he removed his gloves, he recounted the same series of events to another set of officers. He held up the clear plastic baggie originally pulled from Mr. Muldrow's hoodie's front pocket and said, "[t]his was hanging out of his pocket."

46.     While Sergeant Stephan placed the evidence in the passenger seat of his patrol car, Mr. Muldrow said he "had an emergency." Sergeant Stephan opened the back door of the patrol car and responded, "What's up, sir? What's the emergency?"

47.     Mr. Muldrow responded, "Sarge, I'm a convicted felon . . . I work for the City."

48.      Sergeant Stephan replied, "alright, you can't have a gun on you."  The defendant stated, "I didn't have a gun on me," to which Sergeant Stephan replied, "I watched you throw it and then you f*cking fell in the bush after you threw it."

49.     Mr. Muldrow responded, "Sarge, come on, Sarge, can you please give me a chance?"

50.     Sergeant Stephan told him there was nothing he could do and asked him, "what do you want me to do?"

51.     Mr. Muldrow responded, "Sarge, come on, I'm going to be done. I work for the City. You see the ID in my pocket."

52.     Sergeant Stephan asked, "so what are you carrying a gun for?"

53.     Mr. Muldrow looked down and shook his head.

54.     As Sergeant Stephan closed the patrol car door, Mr. Muldrow pleaded, "Sarge, come on, Sarge, please, give me a chance, Sarge, please."

55.     Sergeant Stephan returned to the passenger seat of his patrol car to secure the gun found in the base of the bush.

56.     Backup officers stayed with Mr. Muldrow in the back of the patrol car.

57.     As Sergeant Stephan walked past the back of his patrol car, Mr. Muldrow yelled, "Sarge!"

58.     Sergeant Stephan returned to the rear passenger door and said, "what's up, man?"

59.     Mr. Muldrow responded, "yo man, . . . , I'm going to be done, Sarge." Sergeant Stephan replied, "How do I give you a pass for carrying a gun and, and [sic] bulk narcotics on you?"

60.     Mr. Muldrow's response is inaudible on the body camera footage and Sergeant Stephan did not offer testimony on this response.

61.     The Sergeant then told Mr. Muldrow he would "talk to [detectives] and see what they could do for [him]."

62.     Mr. Muldrow responded, "I have no more chances, sir."

63.     Sergeant Stephan asked, "do you have any warrants, are you diabetic?"

64.     Mr. Muldrow said no and continued to plead with Sergeant Stephan. The body camera footage is not clear on the words and Sergeant Stephan did not offer testimony.

65.     Sergeant Stephan said, "watch your arm" and closed his patrol car door.

66.     Sergeant Stephan then spoke to his fellow officers.  He got back in his patrol car and asked Mr. Muldrow, "you said you're a convicted felon, man? You're not supposed to be possessing a gun? I'm saying there's no permit, nothing like that?"

67.     Mr. Muldrow responded, "you gotta give me a pass, Sarge."

68.     When the police wagon crew arrived, another officer, Officer Nelson allegedly heard Mr. Muldrow on the phone with his girlfriend. Officer Nelson claims he heard Mr. Muldrow say "they got me with a gun." The United States did not offer Officer Nelson's testimony.

69.     The officers transported Mr. Muldrow to the Central Detective Division, where detectives Mirandized him.[17] He did not give a statement to the detectives.

70.     Sergeant Stephan created a report of the incident, including representing he did not conduct a "frisk" under *Terry*.[18] Where the report asks for a search description, he wrote: "Police observed illegal narcotics, crack cocaine, [i]n front hoodie pocket.  Incident to arrest."[19]

71.     We found both Sergeant Stephan's and Officer Kelly's testimony to be credible as to each material fact. The body camera footage confirmed the facts. Their testimony is consistent with the facts they contemporaneously described to their fellow officers at the time of the arrest.

## II.     Conclusions of Law

72.     Under the totality of the circumstances, Sergeant Stephan had reasonable suspicion to stop Mr. Muldrow under *Terry v. Ohio*.[20]

73.     The *Terry* stop did not become an arrest before Sergeant Stephan's discovery of the clear plastic baggie filled with crack cocaine in Mr. Muldrow's front hoodie pocket.

74.     Sergeant Stephan lawfully seized the clear plastic baggie of crack cocaine under the plain view doctrine.

75.     Sergeant Stephan conducted a lawful search incident to arrest.

76.     In the alternative, the drugs recovered from Mr. Muldrow's person are admissible under the inevitable discovery doctrine given the arrest for the gun stashed in the bush and witnessed by Sergeant Stephan.

77.     We deny Mr. Muldrow's motion to suppress his following statements to Sergeant Stephan notwithstanding Sergeant Stephan's failure to provide *Miranda* warnings as Mr. Muldrow volunteered this information without custodial interrogation:

      a.   "The drugs is mine."

      b.   "Can I have a talk with you please?"

      c.   "Sarge, I'm a convicted felon . . . I work for the City."

78.     We grant Mr. Muldrow's motion to suppress his following statements and non-verbal gestures because Sergeant Stephen subjected Mr. Muldrow to a custodial interrogation without first affording him protections under *Miranda*:

      a.   "I didn't have a gun on me."

      b.  "Sarge, come on, Sarge, Can you please give me a chance?"

      c.  "Sarge, come on, I'm going to be done.  I work for the City.  You see the ID in my pocket."

      d.  Mr. Muldrow's shake of the head in response to "so what are you carrying a gun for?"

      e.  "Sarge, come on, Sarge, please, give me a chance, Sarge, please."

      f.  "Sarge! . . . I mean what can I do?  I'm going to be done, Sarge/"

      g.  "I'm gonna lose by job, I'm gonna be done and everything, I don't have no more chances Sarge."

      h.  Mr. Muldrow's shake of the head in response to "so if you had no more chances, then why'd you take the chance of carrying a gun, you know what I mean?"

      i.  Mr. Muldrow's "No" in response to Sergeant Stephan's question about whether he had any outstanding warrants.

      j.  "You gotta give me a pass, Sarge."

79.    Mr. Muldrow's statement, "they got me with a gun," which he made to his girlfriend over the phone, is admissible subject to an evidentiary basis.

### III.    Analysis

**A.    Sergeant Stephan had reasonable suspicion to stop Mr. Muldrow.**

Sergeant Stephan had reasonable suspicion to stop Mr. Muldrow when, while responding to a call about a Black man with a gun at the apartment building, Sergeant Stephen saw Mr. Muldrow walking briskly alongside the building with an L-shaped bulge in his hoodie pocket and observed him stash something in a bush while nervously looking back at the patrol car.

The Fourth Amendment protects individuals from "unreasonable searches and seizures."[21]  While as a general matter warrantless searches and seizures are *per se* unreasonable, the Supreme Court recognizes several exceptions to this rule.[22]  Under *Terry v. Ohio*, an officer may conduct a brief, investigatory stop "when the officer has a reasonable, articulable suspicion

that criminal activity is afoot."[23] "A reasonable, articulable suspicion must be supported by 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."[24] While "reasonable suspicion" is a less demanding standard than probable cause, there must be at least a minimal level of objective justification for the stop.[25]

To determine whether Sergeant Stephan had reasonable suspicion to stop Mr. Muldrow while he walked on Warnock Street behind the apartment building, we use a "totality of the circumstances" test.[26] We consider factors including "[Mr. Muldrow's] location, a history of crime in the area, . . . nervous behavior and evasiveness, and [Sergeant Stephan's] commonsense judgments and inferences about human behavior."[27] We "allow[] officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[28]

Our Court of Appeals recently assessed whether police officers had reasonable suspicion to stop a defendant under *Terry* in similar circumstances. In *Acosta*, the police "had an anonymous tip that someone matching [the defendant's] description was in the area with a gun; the area was known for crime; [the defendant] fled once he saw the police; he clutched something to his side as he ran; and during the chase, he threw away a gun that the police quickly found."[29] Our Court of Appeals explained, while the tip, the flight, and the high-crime nature of the neighborhood on their own could not support reasonable suspicion on their own, the "totality of the circumstances suggested crime."[30]

In *Samuels*, Philadelphia police received an anonymous tip regarding a man with a gun.[31] The tip provided a detailed description of the man and the man's location.[32] Several officers responded to the call and approached a suspect, wearing the clothes described and standing on

the steps of a house located on the corner identified by the tip.[33] The officers asked if he would speak with them, and he kept his back to them and did not acknowledge them.[34] The officers testified he appeared nervous, looking around while moving only his head and upper body.[35] This behavior led the officers to believe the suspect hid something near his waist.[36] The suspect eventually turned and one of the officers testified he saw a "bulge" he believed to be a gun.[37] The officers then drew their weapons and ordered the suspect to put up his hands. Rather than comply, the suspect continued to look around and move his hands and at one point gestured his right hand towards his waist.[38] The officers then approached him, grabbed his hands, and removed the "bulge," which turned out to be a gun.[39] Our Court of Appeals found under the totality of the circumstances, the officers had reasonable suspicion to stop and frisk the suspect under *Terry*.[40] Our Court of Appeals cited, "the tip, the high crime area, the visible bulge in [the suspect's] waist band" along with the suspect's "nervous" conduct and "gestures towards his waist" as facts, which, taken together, would "warrant a man of reasonable caution in the belief that criminal activity may be afoot."[41]

Like in *Acosta* and *Samuels*, under the totality of the circumstances, Sergeant Stephan had reasonable suspicion to stop Mr. Muldrow. Like the officers in *Acosta* and *Samuels*, Sergeant Stephan responded to a tip about a person with a gun, at a specific address in a high-crime area. Mr. Muldrow correctly identifies issues with relying on the veracity of the 911 call, and we agree this call would not, on its own, supply reasonable suspicion to stop Mr. Muldrow. The tip provided no physical description of the suspect beyond his race, and Mr. Muldrow had just arrived at the property around the same time as Officers Dyrda and Kelly. We do not give substantial weight to the fact of the tip. We do give some weight to the tip insofar as it alerted Sergeant Stephan—who did not know Mr. Muldrow had just arrived at the building—a person

with a gun may be at the address in question and informed his belief the "L-Shaped bulge", the object he saw Mr. Muldrow shove in a bush, and/or the object Mr. Muldrow reached for after putting his hands on the car might be a gun.

Like in *Samuels*, Sergeant Stephan saw Mr. Muldrow clutching a bulge, which he believed to be a gun based on his experience serving as Philadelphia police officer for more than thirteen years and more than 250 firearm-related arrests. While Mr. Muldrow did not flee like the suspect in *Acosta*, he acted evasively and nervously and gestured towards his waist once he had been stopped, like the suspect in *Samuels*. When Mr. Muldrow saw Sergeant Stephan, he changed his pace and when he thought Sergeant Stephan could not see him, he hustled toward a bush. Sergeant Stephan observed Mr. Muldrow attempting to hide something in the bush while nervously looking over his shoulder at Sergeant Stephan's patrol car. While Mr. Muldrow rightly points out the tip, his evasive behavior, and the neighborhood each standing alone, would not create reasonable suspicion, all of these factors together with Sergeant Stephan's observation Mr. Muldrow appeared to have a gun and hid something in a bush after seeing a patrol car sufficiently gives rise to reasonable suspicion and justify a *Terry* stop.

**B.    The *Terry* stop did not become an arrest before Sergeant Stephan's discovery of the crack cocaine.**

We deny Mr. Muldrow's motion to suppress the crack cocaine as the fruit of an unlawful arrest. Mr. Muldrow argues Sergeant Stephan already arrested him without probable cause before Sergeant Stephan pulled the clear plastic baggie out of the front pocket of the hoodie. From this premise, he argues we must suppress the crack cocaine as the fruits of an unlawful arrest.[42] The United States argues the initial *Terry* stop had not yet escalated to an arrest when Sergeant Stephan pulled the clear plastic baggie out of the front pocket of the hoodie.[43]  We agree with the United States.

15

We appreciate counsel's advocacy consistent with our Court of Appeals' teaching "[t]he line between a proper *Terry* stop and an improper *de facto* arrest is elusive and not easily drawn."[44] "In considering whether a stop is 'so minimally intrusive as to be justifiable on reasonable suspicion' courts consider the duration of the stop, the law enforcement purposes justifying the stop, whether the police diligently sought to carry out those purposes given the circumstances, and alternative means by which the police could have served their purposes."[45] During a *Terry* stop, officers may take actions "reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop."[46] "There is no *per se* rule that pointing guns at people, or handcuffing them, constitutes an arrest . . . [b]ut the use of guns and handcuffs must be justified by the circumstances."[47]  We must "look to the intrusiveness of all aspects of the incident in the aggregate."[48]

We are guided by our Court of Appeals' analysis a couple months ago in addressing whether the use of service weapons and handcuffs escalated a *Terry* stop to an arrest.  In *United States v. Robinson*, the FBI circulated photographs and a detailed physical description of a robbery suspect.[49] The notices described the suspect as "armed and dangerous."[50] A police officer identified the suspect based on the description in the FBI notices.[51] The officer radioed for backup and approached the suspect.[52] He ordered the suspect to put his hands in the air, but the suspect "kept reaching for his waistband."[53] The officer then drew his service weapon and commanded the suspect to face the wall with his hands in the air.[54] The suspect complied, and when backup arrived, they handcuffed the suspect and took him into custody.[55] In a subsequent motion to suppress, the defendant argued "the stop became an unlawful arrest, rather than merely an investigatory stop, because [the officer] pulled his weapon and forced [the defendant] up against a building, and because [the backup officers] conducted a frisk, used handcuffs, and

detained [the suspect] for twenty to thirty minutes before the show-up identifications."[56] Our Court of Appeals found this argument "unavailing."[57] It explained, "[i]n effectuating a valid stop, police officers are allowed to use a reasonable amount of force."[58] Given the FBI's description of the suspect as "armed and dangerous" and the officer's testimony the suspect "kept reaching for his waistband," our Court of Appeals held "these facts provided justification for [the officer] to pull his weapon and for the other officers to handcuff and frisk [the suspect] to effectuate the *Terry* stop."[59]

Sergeant Stephan believed Mr. Muldrow to be armed based on observing Mr. Muldrow clutching an "L-shaped bulge" as he jogged alongside the apartment building before reaching the sidewalk on Warnock Street. Like in *Robinson*, Sergeant Stephan credibly testified Mr. Muldrow reached for his waistband after Sergeant Stephan instructed him not to move. Sergeant Stephen pointed his service revolver at Mr. Muldrow only while he awaited backup after Mr. Muldrow dropped his left hand off the hood of the red truck. This measure appears reasonable to ensure his safety given the considerable size differential between Mr. Muldrow and Sergeant Stephan might have a gun. When the backup officers arrived, Sergeant Stephan holstered his weapon, approached Mr. Muldrow, and handcuffed him.  Mr. Muldrow is a large man and the officers did not know whether he possessed a gun but they knew the reason for their 911 dispatch focused on a man with a gun in the apartment building. Securing Mr. Muldrow "was reasonably necessary to protect their personal safety and maintain the status quo during the course of [the] stop" while they located the gun.[60] Given the circumstances, the officers used reasonable force to effectuate the *Terry* stop.

**C.      Sergeant Stephan properly seized the clear plastic baggie of crack cocaine appearing in plain view.**

Sergeant Stephan's retrieval of the clear plastic baggie did not run afoul of the Fourth Amendment because the bag and its contents were in Sergeant Stephan's plain view.

Under the plain view doctrine, a police officer who "perceive[s] a suspicious object" "while lawfully engaged in an activity in a particular place . . . may seize it immediately."[61] To show an officer lawfully seized an object under the plain view doctrine, the United States must establish: (1) the officer arrived lawfully at the vantage point from which the object was seen; (2) the object appeared in plain view; (3) the incriminating nature of the object was immediately apparent; and (4) the officer had a lawful right of access to the object seized.[62]

In *United States v. Crespo*, officers approached a vehicle, suspecting the occupants involved in drug trafficking based on an informant's tip.[63]  Nearing the vehicle, officers saw one of the vehicle's occupants withdraw something from her pants and place it in her left coat pocket.[64] When the officers reached the car, they ordered the occupants to get out and put their hands on the car.[65] While the woman placed her hands on the car, an officer "observed a baggie containing white power in her left coat pocket."[66] The officer removed the baggie, and the white powder turned out to be cocaine.[67] The woman moved to suppress the cocaine arguing the search of her pocket violated the Fourth Amendment.[68] Judge Conaboy denied the motion under the plain view doctrine.[69]

Judge Conaboy explained the officers lawfully "arriv[ed] at the place from which the evidence could be viewed as they were conducting a mere investigatory detention or *Terry* stop."[70]  He explained, "the officer's reasonable articulable suspicion that a crime was taking or was about to take place rightfully brought them within arms-length of the Defendant, a distance that would permit viewing of the Defendant's person."[71] He credited the officer's testimony the

plastic bag and its contents appeared in plain view and reasoned, "it is obvious, given the training and experience of the officers, that the viewing officer recognized the white powdery substance as cocaine" and thus the evidence's "incriminating nature" was "immediately apparent."[72]  He further found the stop occurred on a public street where the officers had a "lawful right of access to the object."[73]

In *United States v. Alexander*, four officers responded to a radio call providing an anonymous tip a man driving a brown station was possibly selling drugs on a given block.[74]  An officer pulled over the car matching the description in the tip.[75] The driver wore a bulky, long black jacket with deep pockets.[76] Two additional officers approached the car, and one of the officers reached through the car window into the driver's jacket pocket, and removed a baggie.[77] The baggie appeared to contain narcotics.[78] The officers ordered the driver out of the car, handcuffed him, and patted him down.[79] In doing so, they found additional bags of marijuana.[80] The officers put the driver in the patrol car and searched his vehicle, which yielded a gun and more drugs.[81]

The driver challenged the officer's seizure of the plastic bag of drugs from his jacket pocket, and the United States argued the plain view doctrine justified the seizure.[82] Judge Katz suppressed the evidence, finding "the government failed to demonstrate either that the object was in plain view or that the incriminating nature of the object was immediately apparent."[83] Judge Katz explained the officer who allegedly saw the baggie sticking out of the driver's pocket did not testify, and the other officers did not see the baggie.[84] At the time the officers pulled over the driver, it was dark, although lit with street lamps.[85] He further found "the nature of the jacket hamper[ed] the government's case" because of deep pockets. At the suppression hearing, defense counsel put the recovered baggie in the pocket of the jacket and demonstrated it would have been

very unlikely the bag could protrude.[86]  Judge Katz found "no basis to conclude that [the officer] actually saw marijuana protruding from the pocket, and if he only saw a baggie or the outline of a baggie, there would be further questions as to whether this alone was a sufficient basis to search the defendant's pockets."[87] Judge Katz found these issues "particularly troublesome given the defendant's inability to cross examine [the officer who found the bag]."

Like the officers in *Crespo*, Sergeant Stephan credibly testified he observed a plastic bag sticking out of Mr. Muldrow's pocket and, from his vantage point, he could readily identify the contents of the bag as crack cocaine based on his experience as a police officer. As discussed above, he made this observation while effectuating a *Terry* stop supported by reasonable suspicion, which, as Judge Conaboy explained in *Crespo*, "rightfully brought him within arms-length of [Mr. Muldrow], a distance that would permit viewing of [Mr. Muldrow's] person." This *Terry* stop occurred on a public street like the stop in *Crespo*, giving Sergeant Stephan a lawful right of access to the object.

By contrast to *Alexander* where Judge Katz questioned whether the officer actually saw a plastic bag protruding from the suspect's jacket, there can be no question Sergeant Stephan did, in fact, see a plastic bag sticking out of Mr. Muldrow's pocket because the plastic bag appears clearly in the body camera footage from a few inches to the right of Sergeant Stephan's view. Unlike the large jacket with deep pockets in *Alexander*, Mr. Muldrow's sweatshirt fit snugly and had one large front pocket, open on both sides and completely stuffed in the center—pushing the small sandwich bag to the opening on the left side.  Unlike the officer who supposedly discovered the plastic bag in *Alexander* but did not testify at the suppression hearing and thus did not undergo cross examination, Sergeant Stephan credibly testified he could see the contents of the clear plastic bag and his testimony withstood vigorous cross examination. He explained he

had a better vantage point than the body camera because of the camera's fixed location on the right side of his chest, and the body camera footage corroborates his testimony.

Considering the body camera footage and Sergeant Stephan's credible testimony, we find Sergeant Stephan lawfully seized the plastic bag of cocaine under the plain view doctrine.

### D.     Sergeant Stephan lawfully conducted a search incident to arrest.

Having discovered bulk narcotics in Mr. Muldrow open pocket of his hoodie, Sergeant Stephan had probable cause to arrest Mr. Muldrow and properly conducted a search incident to arrest.

When officers arrest an individual, "it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."[88]  "The permissible scope of a search incident to arrest includes 'the arrestee's person and the area 'within his immediate control,'" or "the area from within which he might gain possession of a weapon or destructible evidence."[89]  The search-incident-to-arrest-exception to the Fourth Amendment's warrant requirement serves two purposes: (1) "protecting arresting officers"; and (2) "safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy."[90]  "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply.[91]  Our Court of Appeals explained "[a]lthough this standard requires something more than the mere theoretical possibility that a suspect might access a weapon or evidence, it remains a lenient standard."[92]  It further held an officer does not eliminate the possibility an arrestee could harm an officer or destroy evidence simply by placing a suspect in handcuffs,[93] but has also noted we should assume the arrestee "was neither an acrobat [nor] a Houdini."[94]

In *United States v. Shakir*, a detective apprehended a bank robbery suspect in a hotel lobby.[95]  Two more armed officers arrived and handcuffed the suspect described by our Court of Appeals as "polite and compliant."[96]  While these two officers held the suspect by the arms, the detective bent down to search the contents of the bag at his feet, which contained a large amount of cash later identified as the cash stolen in a robbery.[97] The defendant moved to suppress the cash, arguing the search of the bag did not constitute a valid search incident to arrest.[98] The defendant argued "because he was already handcuffed at the time [the detective] searched his bag, he had no access to any weapon or destructible evidence that might have been in the bag."[99] Our Court of Appeals rejected the defendant's argument, concluding "there remained a sufficient possibility that [the defendant] could access a weapon in his bag to justify its search."[100]  It explained, "[a]lthough he was handcuffed and guarded by two policemen, Shakir's bag was literally at his feet, so it was accessible if he had dropped to the floor."[101]  Our Court of Appeals continued, "[a]lthough it would have been more difficult for [the defendant] to open the bag and retrieve a weapon while handcuffed, we do not regard this possibility as remote enough to render unconstitutional the search incident to arrest."[102]

In *United States v. Brown*, officers recovered heroin from an arrestee's pockets while conducting a search incident to arrest.[103] Applying the standard articulated in *Shakir*, Chief Judge Sleet held, "[a]lthough [the defendant] was handcuffed at the time [the detective] reached into his pocket and retrieved the heroin, . . . the drugs were discovered as part of a lawful search incident to arrest" because the detective "limited his search to [the defendant's] immediate person, an area from which even a handcuffed suspect might reasonably be expected to access weapons or evidence."[104]

Like the defendants in *Shakir* and *Brown*, the officers handcuffed and surrounded Mr. Muldrow when the search incident to arrest occurred. Like in *Brown*, Sergeant Stephan "limited his search to [Mr. Muldrow's] immediate person."[105] While it would have been difficult for Mr. Muldrow to reach the contents of his front pocket, we do not consider this possibility "remote enough to render unconstitutional the search incident to arrest."[106] Unlike a bag at his feet as in *Shakir,* Mr. Muldrow could access evidence in his open hoodie pocket. The evidence sat unsecured in his pocket, directly on his person, like in *Brown*.

We deny Mr. Muldrow's motion to suppress the crack cocaine and flip-top containers found in Mr. Muldrow's hoodie pocket because Sergeant Stephan discovered them through a lawful search incident to an arrest supported by probable cause.

### E.     We alternatively decline to suppress the drugs under the inevitable discovery rule.

Even if Sergeant Stephan has no basis to search Mr. Muldrow's person under the Fourth Amendment, we still deny Mr. Muldrow's motion to suppress the drugs under the inevitable discovery rule.

Under the inevitable discovery rule, we may admit improperly acquired evidence if the United States can establish, by a preponderance of the evidence, "the evidence at issue would have been discovered through lawful means."[107] The United States can satisfy this burden if it establishes, "the police, following routine procedures, would inevitably have uncovered the evidence."[108] The United States cannot satisfy its burden by relying on speculation, but instead must rely on "historical facts capable of ready verification."[109]

For example, in *United States v. Matthews*, two Philadelphia Police officers received a tip two men appeared to be casing a check cashing business in a gold car.[110] The officers investigated and observed the car, which had stolen license plates, and two men engaging in

strange behavior.[111] The officers stopped one of the men, then carrying a backpack, and asked for his identification.[112]  Shortly thereafter, the officers learned the man had two active warrants for his arrest. They handcuffed the man and took his backpack.[113] An officer opened the bag in the suspect's presence and discovered a handgun, guns, and duct tape.[114] The officer testified she opened the bag in accordance with Philadelphia Police Department protocol.[115] Another officer testified if she had not opened the backpack at the scene of the arrest, "the backpack would have been opened and inventoried by the cell block attendant."[116]  The defendant moved to suppress the contents of the backpack.[117] Judge Pratter denied the motion. Judge Pratter first found the search of the backpack did not constitute a valid search incident-to-arrest because the police handcuffed the suspect and locked him in the back of a police car when the officer searched his backpack outside the car, and thus he had no means of gaining access to the bag to destroy evidence or access a weapon.[118]

But Judge Pratter nevertheless admitted the evidence on two grounds. She determined the on-scene inventory search constitutionally permissible because the police "administered [the search] in good faith" based on "reasonable police regulations."[119] She also determined even if she struck down the on-scene inventory search at the scene, "the Government has proven by a preponderance of the evidence that the contents of [the] backpack would have been discovered when the backpack was inventoried at the police station."[120] Judge Pratter denied the motion to suppress the contents of the backpack under the inevitable discovery rule.[121]

In *United States v. Clemons*, police officers noticed a large bulge in the pants of a suspect in custody.[122]  The officers, aware the suspect had previously sought to conceal narcotics near his genitals, subjected the suspect to a strip search and found packets of a controlled substance. Reviewing a denial of the suspect's motion for suppression, our Court of Appeals held, "[e]ven if

we assume *arguendo*, the search was unconstitutional, the evidence is admissible under the doctrine of inevitable discovery" because the drugs "would have been found during the routine intake process that is conducted before anyone is admitted to a detention facility."[123]

If Sergeant Stephan had not searched Mr. Muldrow on the scene, the police would have inevitably discovered the crack cocaine in Mr. Muldrow's pockets through lawful means after they arrested Mr. Muldrow for the firearm offense. Mere seconds after Sergeant Stephan discovered the crack cocaine and flip top containers in Mr. Muldrow's open hoodie pocket, one of his officers discovered a gun in the bush where Sergeant Stephan saw Mr. Muldrow trying to hide something. Upon discovering the gun, the officers had probable cause to believe Mr. Muldrow, who appeared to have made furtive attempts to conceal the weapon in a bush upon seeing Sergeant Stephan, could not lawfully carry a firearm. As Sergeant Stephan testified, Philadelphia police officers, as a matter of established procedure, search suspects at the police station when they are processed. Even if Sergeant Stephan had not pulled the drugs out of Mr. Muldrow's pocket before his fellow officers discovered the drugs, an officer inevitably would have discovered the drugs while processing Mr. Muldrow at the station.

### F. We grant in part and deny in part Mr. Muldrow's motion to suppress his statements made to Sergeant Stephan.

While Mr. Muldrow made certain statements to Sergeant Stephan unprompted, he made others while subject to a custodial interrogation, and we must suppress these later statements. Mr. Muldrow asserts two bases for excluding his statements to Sergeant Stephen: (1) the statements are the fruit of an unlawful seizure; and (2) Sergeant Stephan elicited the statements during a custodial interrogation without first providing *Miranda* warnings. As discussed above, the initial stop of Mr. Muldrow is supported by reasonable suspicion and the eventual arrest supported by probable cause, and thus we deny Mr. Muldrow's motion to suppress the

statements as the fruit of an unlawful seizure. We consider only whether a *Miranda* violation warrants suppression.

The United States may not use statements elicited during a custodial interrogation unless the defendant has first received his *Miranda* warnings.[124]  Our Court of Appeals "has recognized that 'custodial interrogation' is not susceptible of an exact definition; thus the determination whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis."[125] To determine whether the statements resulted from a custodial inquiry, we must determine: (1) whether, and/or at what point, did Mr. Muldrow enter police "custody"; and (2) whether the police "interrogated" him.[126] "In determining whether an individual is in custody, the ultimate inquiry is: 'whether there is a 'formal arrest or restraint of movement' of the degree associated with a formal arrest."[127] The Supreme Court has made clear, "[t]here can be no question that [a defendant] [is] 'in custody as of the moment he [is] formally placed under arrest and instructed to get in police car."[128] "[T]he term 'interrogation' under *Miranda* refers to . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit a response."[129] "An incriminating response is 'any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial."[130] "Police may not, however, 'be held accountable for the unforeseeable results of their words or actions[,]' . . . and to constitute an interrogation their conduct 'must reflect a measure of compulsion above that inherent in custody itself.'"[131] The "interrogation analysis focuses 'primarily upon the perceptions of the suspect, rather than the intent of the police.'"[132]

Mr. Muldrow made several statements during his encounter with the police before the police gave him his *Miranda* warnings.  He made these statements, not all at once under similar

conditions, but at several different points under various conditions.  We analyze these statements in turn.

### 1. "The drugs is mine."

After Sergeant Stephan handcuffed Mr. Muldrow but before he placed Mr. Muldrow in the police car, Mr. Muldrow said unprompted "[t]he drugs is [sic] mine."  Sergeant Stephan did not in any way prompt Mr. Muldrow's spontaneous admission regarding his ownership of the drugs. There is no evidence of interrogation. We deny Mr. Muldrow's motion to suppress this statement.

### 2.  "Can we have a talk with you please?"

In response to Mr. Muldrow's statement regarding the drugs, Sergeant Stephan said "ok I watched you throw the gun too, man, so just relax." Mr. Muldrow said "can I have a talk with you please?" to which Sergeant Stephan responded "yeah I'll talk to you in a second, alright, let's go this way."  Sergeant Stephan then took Mr. Muldrow to the police car, shut the door and walked away.

Under these circumstances, Sergeant Stephan's statement did not seem reasonably likely to elicit an incriminating response. The body camera footage confirms Sergeant Stephan is attempting to avoid further conversation with Mr. Muldrow, by cutting him off, telling him they can talk later, putting him in the police car, and shutting the door. We deny the suppression motion to the extent it seeks to suppress Mr. Muldrow's request to have a talk.

### 3.  "Sarge, I'm a convicted felon."

After Sergeant Stephan recovered the gun from the bush, photographed the evidence, and spoke with fellow officers, he returned to the patrol car to secure the recovered evidence in his patrol car, Mr. Muldrow told him he "had an emergency." Sergeant Stephan responded, "What's

up, sir? What's the emergency?" Mr. Muldrow responded, "Sarge, I'm a convicted felon . . . I work for the City."

Again, his questions "What's up, sir? What's the emergency?" do not constitute interrogation because they are mere inquiries into Mr. Muldrow's well-being in response to a claimed emergency.[133] We do not wish to discourage officers from checking in on a person in custody claiming to be having an emergency. We cannot find this statement responsive to interrogation and deny Mr. Muldrow motion to suppress this statement.

### 4. "I didn't have a gun on me. . . "

In response to Mr. Muldrow's admission regarding his status as a convicted felon, Sergeant Stephan said, "alright, you can't have a gun on you." Mr. Muldrow then responded, "I didn't have a gun on me," to which Sergeant Stephan replied, "I watched you throw it and then you f*cking fell in the bush after you threw it." Mr. Muldrow then said, "Sarge, come on, Sarge, can you please give me a chance?" Sergeant Stephan told him he could do nothing and asked him, "What do you want me to do?" Mr. Muldrow responded, "Sarge, come on, I'm going to be done. I work for the City. You see the ID in my pocket." Sergeant Stephan asked, "so what are you carrying a gun for?" Mr. Muldrow looked down and shook his head. As Sergeant Stephan closed the car door, Mr. Muldrow plead, "Sarge, come on, Sarge, please, give me a chance, Sarge, please."

Sergeant Stephan returned to the passenger seat of his patrol car to secure the firearm. Backup officers stayed with Mr. Muldrow at the back of the car. As Sergeant Stephan walked past the back of the patrol car, Mr. Muldrow exclaimed, "Sarge!" Sergeant Stephan returned to the rear passenger door and said, "What's up, man?" Mr. Muldrow stated, "I mean, what can I do? I'm going to be done, Sarge." Sergeant Stephan replied, "How do I give you a pass for

carrying a gun and, and [sic] bulk narcotics on you?" The Sergeant then told him "that's something you're gonna have to talk to the detectives about" and he told Mr. Muldrow he could "talk to [detectives] and see what they could do for [him]." Mr. Muldrow stated, "I'm gonna lose my job, I'm gonna be done and everything, I don't have no more chances, Sarge." Sergeant Stephan responded, "so if you had no more chances, then why take the chance of carrying a gun, you know what I mean?" Mr. Muldrow just shook his head. Sergeant Stephan then asked "you have any warrants?" and whether Mr. Muldrow had diabetes. Mr. Muldrow said no and shut the door. Sergeant Stephan got back in the car and said "you said you're a convicted felon, man, you're not supposed to be possessing a gun? I'm saying there's no permit or nothing like that?" Mr. Muldrow responds "you gotta give me a pass Sarge."

These exchanges with between Sergeant Stephan and Mr. Muldrow cross the line into interrogation. *United States v. Brownlee* is instructive.  In *Brownlee*, the defendant stole a jeep at gunpoint and subsequently crashed it.[134] Secured in the police cruiser, the defendant initiated a conversation with the officer, yelling, "can you turn the air conditioning on?" and asked if he could call his father.[135] The officer and the defendant continued talking. The officer said "[d]id you look up there at that Jeep . . . [h]ow crushed it is. You could have been killed. How did you get out of here?"  He further said "[y]ou know, you were just in trouble . . . you just got out jail . . .  why would you do something dumb like this? With a gun?"[136]  In analyzing this exchange, our Court of Appeals stated, "it is difficult to imagine questions more likely to evoke and incriminating response—that is, a 'statement []amounting to 'admissions' of part or all of the offense."[137]  It thus concluded "the officer subjected the defendant to an 'interrogation' without providing the warnings demanded by *Miranda*."[138]

Like the defendant in *Brownlee*, Mr. Muldrow struck up a conversation with Sergeant Stephan while sitting in the back of a police car.  Like the officer in *Brownlee*, Sergeant Stephan asked several questions seemingly designed to elicit statements amounting to "admissions of all or part of the offense" charged. Sergeant Stephan appears to make several attempts to get Mr. Muldrow to admit he was, in fact, carrying the gun—which the officers did not discover on his person. He seems to be further trying to get Mr. Muldrow to confirm his status as a convicted felon and admit he knew he could not lawfully carry a gun based on his status as a convicted felon—admissions critical to proving the firearm offenses charged.

We grant Mr. Muldrow's motion to suppress any or all of his statements to Sergeant Stephan following Sergeant Stephan's statement saying, "alright, you can't have a gun on you."

> **G.     We deny Mr. Muldrow's motion to suppress the statement he made on the phone to his girlfriend.**

Mr. Muldrow moves to suppress the statement he made on the phone to his girlfriend as fruit of an unlawful seizure.  Mr. Muldrow offers no other reason to suppress the statement to his girlfriend about a gun.  As discussed above, the police lawfully seized Mr. Muldrow.  We deny his motion to suppress the statement made to his girlfriend.

## IV.     Conclusion

After carefully evaluating the credibility of Sergeant Stephan's extensive testimony, Officer Kelly's testimony, and the body camera footage,  we deny Mr. Muldrow's motion to suppress the crack cocaine and packaging materials found in his hoodie pocket.  We also deny Mr. Muldrow's motion to suppress statements voluntarily offered outside of custodial interrogation.   We grant Mr. Muldrow's motion to suppress his statements responsive to custodial interrogation.

¹ While arising in the context of a citizen's right to film police conduct in appropriate instances subject to time, place and manner concerns, our Court of Appeals' observation in *Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017) is apt both as to Mr. Muldrow's motion to suppress as well as our Opinion issued last week in *United States v. Bryant*, No. 20-86, 2020 WL 6381386 (E.D.Pa. Oct. 30, 2020) granting a motion to suppress evidence gathered by another Philadelphia police officer not equipped with a body camera. We continue to find benefits in officers wearing body cameras when at all possible consistent with our Court of Appeals' observation in the context of citizen recording of video activity:

> And just the act of recording, regardless of what is recorded, may improve policing. Important to police is that these recordings help them carry out their work. They, every bit as much as we, are concerned with gathering facts that support further investigation or confirm a dead-end. And of particular personal concern to police is that . . . recordings can "exonerate an officer charged with wrongdoing."

*Fields,* 862 F.3d at 360 (quoting *Turner v. Lieutenant Driver*, 848 F.3d 678,689 (5ᵗʰ Cir. 2017)).

² At some point, another officer spoke to the woman living in Apartment 43—the unit specified in the 911 call. She explained she had just returned from work and had not requested police assistance. She further explained Mr. Muldrow is the godfather, not the father, of her children.

³ The Philadelphia Police Department directs its officers' use of Axon body-worn cameras for some but maybe not all police districts presumably compliant with its June 21, 2016 Directive 4.21. When an officer activates the body camera, footage records the video of the sixty seconds immediately before activating the camera at which point we can hear the audio. The admitted footage from the body cameras confirm daylight at the time of the encounter one year ago with Mr. Muldrow.

⁴ N.T. 34:34:6-13; 35:11-15.

⁵ *Id.* 36:9-16.

⁶ *Id.* 36:17-37:2.

⁷ *Id.*40: 24-41:5.

⁸ *Id.* 43:24-44:13.

⁹ *Id.* 48:24-49:8.

¹⁰ *Id.* 42: 14-25.

¹¹ *Id.*

¹² *Id.*

[13] *Id.* 50:17–22.

[14] *Id.* 53:15–19; 56:24–57:15.

[15] *Id.* 57:20–58:3.

[16] *Id.* 63:4–10.

[17] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[18] Def. Ex. 4.

[19] *Id.*

[20] 392 U.S. 1 (1968).

[21] U.S. Const. amend. IV.

[22] *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993).

[23] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[24] *United States v. Holloway*, 489 F. App'x 591, 593 (3d Cir. 2012) (*quoting Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)).

[25] *Wardlow*, 528 U.S. at 119.

[26] *United States v. Nelson*, 284 F. 3d 472, 478 (3d. Cir 2002).

[27] *United States v. Acosta,* 751 F.  App'x 201, 202 (3d. Cir. 2018).

[28] *United States v. Slone*, No. 16-400, 2017 WL 1042074, at *2 (E.D. Pa. 2017) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[29] *Acosta,* 751 F. App'x at 203.

[30] *Id.*

[31] *United States v. Samuels*, 131 F. App'x 859, 860-61 (3d Cir. 2005).

[32] *Id.*

[33] *Id.* at 861

[34] *Id.*

[35] *Id.*

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 862.

[41] *Id.*

[42] ECF Doc. No. 17 at 6.

[43] ECF Doc. No. 19 at 12-15.

[44] *United States v. Leal*, 235 F. App'x 937, 940 (3d Cir. 2007).

[45] *Id.* (quoting *United States v. Place,* 462 U.S. 696, 709 (1983)).

[46] *United States v. Hensley*, 469 U.S. 221, 235 (1985).

[47] *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995).

[48] *Id.*

[49] *United States v. Robinson*, 821 F. App'x. 141, 142 (3d Cir. 2020).

[50] *Id.*

[51] *Id.* at 143.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* at 144.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Hensley*, 469 U.S. at 683-684.

[61] *United States v. Yamba*, 506 F.3d 251, 256 (3d Cir. 2007).

[62] *United States v. Alexander*, 73 F.Supp. 2d 489, 491 (E.D.Pa. 1999).

[63] *United States v. Crespo*, 868 F.Supp. 79, 81 (M.D. Pa.  1994).

[64] *Id.* at 81-83.

[65] *Id.*

[66] *Id.* at 82.

[67] *Id.* at 83.

[68] *Id.* at 82.

[69] *Id.* at 83-84.

[70] *Id.*

[71] *Id.*

[72] *Id.* at 84.

[73] *Id.*

[74] *Alexander*, 73 F. Supp. 2d at 490-91.

[75] *Id.* at 491.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.* at 491-92.

[87] *Id.* at 492.

[88] *United States v. Shakir*, 616 F.3d 315, 317 (3d Cir. 2010).

[89] *Id.* (quoting *Chimel v. California*, 395 U.S. 753, 763 (1969)).

[90] *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (citing *Chimel*, 395 U.S. at 763).

[91] *Id.*

[92] *Shakir*, 616 F.3d at 321.

[93] *Id.*

[94] *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (quoting *United States v. Abdul-Saboor*, 85 F.3d 664, 669 (D.C. Cir. 1996)).

[95] *Shakir*, 616 F.3d at 316.

[96] *Id.*

[97] *Id.* at 317.

[98] *Id.*

[99] *Id.*

[100] *Id.* at 321.

[101] *Id.*

[102] *Id.*

[103] *United States v. Brown*, No. 12-cr-23, 2013 WL 124280, at *5 (D. Del. Jan. 8, 2013).

[104] *Id.*

[105] *Id.*

[106] *Shakir,* 616 F.3d at 316.

[107] *United States v. Vasquez de Reyes*, 149 F.3d 192, 195 (3d Cir. 1998).

[108] *Id.*

[109] *Id.*

[110] *United States v. Matthews*, No. 09-612, 2010 WL 2671388, at * 1-2 (E.D. Pa. July 1, 2010).

[111] *Id.*

[112] *Id.*

[113] *Id.* at * 3.

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.* at * 6.

[119] *Id.*

[120] *Id.* at * 7 n.6.

[121] *Id.*

[122] *United States v. Clemons*, 499 F. App'x 207, 209 (2d Cir. 2012).

[123] *Id.*

[124] *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980).

[125] *Id.*

[126] *Id.* (citing *Orozco v. Texas*, 394 U.S. 325 (1969)).

[127] *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beleher*, 463 U.S. 1121, 1125 (1999)).

[128] *Berkemer v. McCarty*, 468 U.S. 410, 434 (1984).

[129] *United States v. Brownlee*, 454 F.3d 131, 146-147 (3d Cir. 2006) (quoting *Rhode Island v. Innis*, 446 U.S. 291 (1980)).

[130] *Brownlee*, 454 F. 3d at 146 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 n.5 (1980)).

[131] *Id.* (quoting *Innis*, 446 U.S. at 300, 302).

[132] *Id.* (quoting *Innis*, 446 U.S. at 296).

[133] *See* David M. Nissman and Ed. Hagen, Law of Confessions §5.14 General Conversations.

[134] *United States v. Brownlee*, 454 F.3d 131, 134-35.

[135] *Id.* at 145.

[136] *Id.*

[137] *Id.* at 147.

[138] *Id.*